JUDGE LYONS
concurred in the opinion, and the will was established.
I will dismiss this case of Yerb3* v. Yerby for the present; merely saying that it is full up to the case before us, in the *very point, and must overthrow the idea of revocation entirely, unless the witnesses, and particularly Mr. Wood-son, a man of the highest respectability, and whose manner of giving testimony (in the view of this Court) did him hpnour, shall be adjudged by us to be perjured.
I trust I have proved, by this detail, beyond the possibility of a doubt, that parol evidence of facts or circumstances; that declarations of the testator after the making of the will, and even before it, and up to-the time of his death; nay, even, in the emphatical language of Lord Mansfield, that “every kind of evidence” is admissible upon the question of revocation. The only desideratum is, whether the testator considered it as a subsisting will, or a revoked will at the time of his death. It is not material, if the former, that it was not a will entirely to his mind. The case of Yerby v. Yerby proves this expressly ; as *753 also the case of Cogbill v. Cogbill, in which this Court established a codicil pro tanto, although the testator wanted to add something else thereto, which he did not live to effect: we established it as his codicil, as the Court did the will of Yerby, although neither of them were entirely to the mind of the testator, but he wished to alter them in both instances.
In pursuance of these principles, if, in the case before us it were proved, that the testator declared at the time of cutting away his name, that he meant thereby to revoke both the will and the postscript; and, in pursuance thereof, had cut out his name in the manner he has done; can any man hesitate to say, that the whole would not have been thereby revoked? In such case, an act which, standing singly, might be considered equivocal, as to the extent of the cancellation, would be explained and rendered certain, as to the intention of the testator, and consequently as to the effect of the act, by the testimony’ of his declaration at the time. In the case actually before us, in the absence of declarations made by him at the time, his intention at that period, in executing that act, may as well be established by his posterior declarations and admissions. These may be resorted to *either to shew that this cancelling was intended at the time to extend to the postscript, as well as the will, or that, at a subsequent time, this act was recog-nised and adopted by him in that enlarged and extended sense; that he, at such future time, considered the established will as a subsisting, and not a revoked one.
The foregoing cases abundantly shew, therefore, that it is not the mere act of cancelling itself, which determines the question: the cancelling or the revoking act only shews the intent of the testator to revoke or cancel; and where it is equivocal, its effect may be explained, narrowed, enlarged, or done away by the production of other testimony.
Having thus endeavoured to pave the way’, therefore, I will briefly consider the testimony before us. Hr. Woodson tells us that, in the February or March before the testator died, he was two or three times at his house, when the subject of both his wills was mentioned; that the testator informed him “that he had a will, which he wrote many years ago, but did not like it and would make another in a very short time, and that this conversation was a little before the death of the testator;” that the testator was not satisfied with this will, as being less favourable to his mother than he intended. This evidence shews the testator’s admission of a subsisting will; one indeed which he intended to alter, but which was still a will until it should be revoked or altered. (See Yerby v. Yerby, 3 Call, 384.) This admission repels the idea of the existence in force of the postscript In question; or, rather, admits that it was cancelled, as well as the body of the will: for, if it were still in force, as an independent act of revocation, the will of 1799 was destroyed, and was not a subsisting will; as the testator is proved to have considered it. This admission explains therefore the extent of the act, supposed to be equivocal, of cutting away his name from the cancelled will. In answer to a question, this witness also said, that he understood from the testator that “the second will was cancelled and the first will then in existence, and in the keeping of his mother, but that he did not like it.” In ^answer to another question, he said, the “testator spoke of having made a subsequent will and having cancelled it; and that the first will was in force, and in the keeping of his mother.” Nothing is said, any where, of the idea of any person, that there ever were more than two wills, or that there was any distinct declaratory and revoking act or instrument; — that discovery was reserved for the ingenuity of the appellant’s counsel; and, when the testator, long after the cancellation in question, considers the first will as in force, (which he could not have so considered if the postscript was a distinct existing act of revocation,) is not this conclusive to shew his idea that the cancellation was intended to extend, and, therefore, did extend to the postscript as well as to the will? This witness, Mr. Woodson, had frequent conversations with the testator on the subject; received from him similar answers at various times, nearly up to the period of his death; and the character and manner of giving evidence of this witness are entitled to the greatest attention. Mr. Bradshaw corroborates this testimony by saying that, in March, 1808, the testator told him, “he had a will, and that nothing should prevent him from taking care of his mother.” — Mr. Hopkins also confirms it, by saying that, in December, 1807, he understood from the testator, that he had a will; and for a number of years had kept a will by him.
This testimony, therefore, of several corroborating witnesses, and relating to different times and conversations, shews the uniform sense of the testator, long after the act of cancellation in question ; that the will now established by the judgment of the District Court was a subsisting will; and there is no witness to prove, that any other idea was ever held by him: it consequently determines the extent of the testator’s intention in relation to the act of cancellation, as coming from his own mouth, and when he stood entirely indifferent to declare the truth; and, with me, is equally conclusive with testimony going to establish his declared intentions as at the time of executing the act.
*This testimony, therefore, like the declaration proved, in Yerby’s case, to have been made by the testator in his last illness, that he had a will which however he intended to alter, thereby admitting that the will was not revoked by the second marriage ; or, on the other hand, like the admission by the testator in the case of Wilcox v. Rootes, saying, on the night before his death, that he had a desire to make some provision for the devisee, that the will formerly made in his favour was revoked, or did not exist; this testimony, as in those cases, proves beyond a doubt, that the testator, long after the act of cancellation, admitted, by these expressions, that the first will was not revoked, but was still subsisting, and consequently that the act *754 •of cancelling- had extended to the whole writing.
Is there on the other hand, any testimony which weighs down this testimony; or, rather, which may not be reconciled with it ? — or is there any testimony adequate to shew that, subsequent to the testator’s acknowledgment of the will as a subsisting will, as aforesaid, he did any act to destroy or revoke it? The latter is not pretended : — let us briefly examine the former.
The testimony of Miss Heath is, that the testator wished he had “a good willand that he often repeated the idea. This is entirely consistent with the foregoing testimony ; viz. that the testator had a will, but was not satisfied with it: it was such a one as perhaps, he did not esteem a good will as he intended to alter it; but yet it is a legal will until revoked or altered. Mr. Gray’s testimony only shews that the testator meant to alter his will, by leaving instructions therein touching the manner of his burial. As to the testimony of Mr. Bolling, it is, that the testator three or four weeks previous to his death, said “that it was .inexcusable for a man not to keep a will by him ; particularly a man in his situation ; that he was determined* not to be without one many days ; and that no business should prevent it.”
This testimony is susceptible of the same answer, viz. that he had no will by him that was entirely to his mind ; *and that many days should not elapse before he would have one of this character. The appellant have not proved that the testator ever declared that he had no will by him; whereas, on the other hand, it is proved that he often declared, that he had •one, and that one a will in force, and in possession of his mother; one, however, I admit, with which he was not perfectly satisfied, as not being sufficiently favourable to his mother, and which he intended to alter. My deduction from all this respectable testimony is, that all the witnesses have sworn to the truth ; but that the testimony last mentioned must be taken under the restriction just stated.
We must take it under this restriction ; impute perjury to the very respectable witnesses for the appellees who have sworn, affirmatively, to the testator’s recognition of the will in question as a subsisting will; or the declaration of Mr. Bolling, (the only witness for the appellant, whose testimony is not easily so to be reconciled,) must stand justified by some posterior will, or declaratory act of revocation ; posterior, I mean, to the point of time to which the testimony of Woodson and the other witnesses relates.
No such will or act is pretended ; but, if any such testamentary paper does in fact exist, and should ever hereafter appear, it will take place of the will now established : at present, such a testamentary paper is entirely in nubibus, and therefore, no injury can arise from giving the preference to the testimony going to establish the will in question.
The appellee in this case having entirely succeeded in proving recognitions of the established will by the testator, nearly up to the time of his death, it would have been incumbent on the appellant, in order to rebut the same and justify Bolling’s testimony, taken in an absolute and unqualified sense, to shew that the postscript in question (or some other revoking act) was written after the period of such acknowledgments. This he has not done, and cannot do : — on the contrary, it is established entirely to my satisfaction, that that postscript was written at. the *same time with the will, as aforesaid, or, at any rate, prior to the act of cancelling in question.
As to the conversations of old Mrs. Bates respecting the wills, as detailed by Miss Heath, I put them out of the question.
The declaration of old Mrs. Bates, that her son asked her if she had given up the will, was merely hearsay from old Mrs. Bates : it is not (as some seeming indistinctness in Miss Heath’s deposition might seem, at first, to indicate) an inquiry which the witness heard the testator make of his mother : it is therefore not to be considered as evidence in the cause. If, however, these declarations are to be relied on ; while, on the one hand, this inquiry could not go further than to import, at most, some dissatisfaction on the part of the testator, with his will, which consequently he wished to alter, the declaration must be taken altogether, and then another part of it goes to fix the period of time when the act of cutting out the name took place ; that is, at or about the time of her son’s marriage ; and they consequently carry back that act far beyond the time of the various acknowledgments of the testator, respecting the existence of his first will, as proved by the testimony. As to the uncertainty of this lady, whether the first will had been returned to her, or not, it is unimportant; but, it is proved that the testator, in March, 1808, acknowledged it to be in her custody. ■ With respect to the emotions created in the breast of the old lady, bv the production of the will in question, they are equally honourable to her character and feeling's as a mother, and to the filial duty and affection always manifested towards her by her son. It is entirely within the compass and character of human nature, that the hearts of those who, being duly prepared, can bear the shocks of adversity with fortitude, should be moved and melted with the sudden presentation of scenes involving the most dear and tender recollections. The circumstance now so much commented on by the appellant’s counsel, can only be viewed in an aspect to do honour to the character of the respectable parties implicated : as to its having been caused by any ^improper or dishonourable conduct on the part of this lady, there is not the least pretence for such an idea.
Great stress has been laid on the circumstance of this cancelled will being found in a box contained in a trunk with other papers ; whence it is inferred that the postscript is a preserved and not a cancelled paper. That circumstance, standing singly, would prove nothing, as many men are in the habit of preserving every paper they ever had in their lives ; and, as the appellant’s counsel have succeeded in proving the testator to have been one of the most precise and particular men in the world, this habit may be well imputed to him. But the circumstance does not stand single ; or, if it does, it is at most but equivocal and also liable to be explained *755 by testimony. This equivocal circumstance, (to say the most,) going- to shew that the postscript continued in force, is outweighed by the testator’s repeated admissions, as aforesaid, that it was notin force; or, what amounts to the same thing, that the first will was in the force and in the keeping of his mother. The circumstance, as it often happens in relation to circumstances, is outweighed by positive proof.
But, on the other hand, keeping all the testimony out of the question, and arguing •from this circumstance only, how does it happen that the testator (the most precise and particular man in the world) should leave the validity of a revoking act to rest upon the doubts, (to say the least,) resulting from its being contained in a paper cut through and cancelled, and to stake the effect of such an important instrument upon eight formal words, to be found in almost every will whatsoever ; and that this state of things should have been continued by him for two years after the cancellation? Was paper scarce with him, a lawyer in very extensive practice ? was he indolent ? or did he not possess leisure or talents to write a less exceptionable instrument ? Neither of these will be pretended.
As to the will in question, it is in proof that the testator meant to provide further for his mother. It is her misfortune that he did not live to do it: but the will, being admitted to be in force, although he intended to alter it, must ^operate as far as it goes. As to Clemensa, it is, perhaps, her misfortune that the testator died intestate: I say, perhaps, for circumstances might have happened to change his opinion on that subject, tier’s is, at most, the common case of a party’s failing to provide by will for those who have strong claims upon him. All that we have to decide, is, whether the testator has made a will or not ; not whether it is such as he ought to have made, or whether it extends the whole length of his intentions on the subject.
I have thus stated to you, sir, some of the grounds of my present opinion. I have taken up this case as it were a new case ; as if it had never, until now, been before this Court. I have forgotten, or, at least, endeavoured to forget, that I ever before .gave an opinion upon it. That magnanimity which has often induced this Court to rehear its decisions, and give up its former errors, would be but illy maintained by proceeding upon a ny other idea : it would be violated and degraded, were any Judge not to consider himself as free as the winds of heaven to make up his opinion de novo.
I have heard every thing which has been said on this second argument, with patient and calm attention. I have relinquished, ■perhaps, some of the ideas I expressed on the former occasion, and others have shed new lights upon my mind. If my opinion is not changed as to the great result of this cause, it is because I can never be brought to agree that two and two do not make four.
I have formed my opinion in this case from an anxious attention to every atom of testimony in the cause, and from an inspection and consideration of the identical writings in question, under all their appearances and circumstances. These, down to the fortieth part of a hair, are important in my estimation: but perhaps, they cannot all be presented, in the reports, precisely as they have appeared to us. Upon the facts and documents proved and exhibited in the cause, I cannot have a scintilla of doubt, but that the testator died leaving as his last will the paper which has been established as such by the judgment of the District Court.
*The other Judges are, however, upon the testimony, of a different opinion ! Those Judges being also of opinion, that this is not even a case of so much doubt, upon the testimony, as to make the intervention of a Jury desirable ! — I have not made up my mind upon a question of law of the greatest importance, which a contrary view of facts, on their part, would have presented for decision : namely, whether this Court has power, in a case like the present, to direct an issue of revocavit vel non.
I beg to be understood as giving no opinion on this important question ; but I shall not conceal that my impressions are always in favour of the maxim “ad questiones facti respondent juratores in favour of the ordinary and constitutional mode for the ascertainment of facts; nor can I readily discern the utility of devoting the precious time of this high tribunal, entrusted with the consideration and ascertainment of principles of law and equity, to subjects to which the genius of our constitution and laws admit, that Juries are better adapted; of exhausting the precious time of this Court in watching the countenances of the witnesses who depose before it, and in determining, for example, whether this or that particular witness is the most deserving of credit.'
I conclude, sir, by giving it as my opinion that the judgment of the District Court, establishing the will of the 16th of November, 1799, is correct and ought to be affirmed.
JUDGE DEEMING. This being a case of much expectation and solicitude, as to the parties interested ; and differing from a worthy Judge, for whose opinions I have the highest respect, I must take more time than usual in stating the grounds of my opinion, and shall necessarily occupy a considerable portion of the ground taken on a former occasion.
With respect to directing an issue, on the suggestion of the appellee’s counsel, at the late argument of the cause ; that proposition has been, to my mind, sufficiently answered by the worthy Judge who first delivered his opinion ; and *with whom, on this point, I fully concur, so far as it respects expediency in the present case, as I want no verdict of a Jury to ascertain a fact, that to me appears as plain as the meridian sun. But as to the power of the Court to direct an issue, I give no opinion at present; not having considered it with sufficient attention.
With respect to the merits of the case : the important question before the Court is, whether the writing admitted to record by the District Court of Richmond,- as the last will and testament of Charles Fleming Bates, was, at the time of his death, truly his last will, or whether it was not absolutely revoked by the testator in his life-time. In deciding which, I shall first consider the case, as it appears from the written evidence, *756 alone ; and then on the written and oral testimony taken together ; and it will not be amiss to take a short retrospective view of the situation and circumstances of the testator, and of his connections, at different periods, from the date of the writing in controversy, at the time of his death.
At the former period he lived in the house of an indulgent father, who had paid particular attention to his education and morals, and who was, unfortunately, in declining circumstances.
The testator was then a bachelor, and had lately commenced the practice of the law ; and being a man of respectable talents, of great' diligence and economy, had a well grounded prospect of improving his fortune. Being thus circumstanced, he, on the 16th day of November, 1799, made the will now in controversy ; the whole of which is in his own hand-writing ; at which time both his parents, and several brothers and sisters were living; and prompted, I conceive, as well by paternal affection, as by gratitude for the care and indulgence of his parents, they appear to have been the first and principal objects of his solicitude and bounty. And in the latter part of his will he directs his slave Isaac to be free at twenty-one, and Charlotte at eighteen years of age ; and lastly, gave his trustee ten per cent, on the profits of his estate, for his trouble.
*This will (as appears from evidence) was sealed up, directed to his mother, and delivered to her for safe keeping; and nearly two years thereafter, the testator having for a large sum of money purchased the mansion and plantation where his father dwelt, (called Belmont,) he received the will from his mother, broke the seal, and added a codicil, in the following words, to wit, “I wish the balance of the purchase-money of Belmont to be raised by my said executor, as soon as possible, from the debts due me, and a title made to my said executor, as trustee, in like manner as the personal estate; and as to Isaac and Charlotte, I revoke the proceeding part of my will, but not to any thing else.
(seal.) Signed “Ch. F. Bates.
“Sept. 23d, 1801.”
After adding this codicil, he resealed the will, and returned it to his mother; and having made pecuniary engagements, perhaps beyond what he formerly contemplated, he found it expedient to retract the benevolence he once intended towards his slaves, Isaac and Charlotte ; and to make ample provisions for discharging those engagements, and fulfilling the former purpose of his will.
About two years thereafter, his circumstances having been considerably changed, and having formed an imprudent (though not uncommon) temporary connection; on the 2d day of September, 1803, he thought proper to make a new will, (which, without a special clause for the purpose, would, at his death, have virtually revoked the former,) in the first clause of which he declared his .most ardent wish to render his mother happy and easy during life ; also his father, and ail his children, as long as they, or any of them, continue in his family, remain single, or, in the discretion of his executor, should need assistance. And after a further disposition of his estate, on the death of his father and mother, he recognized the fruit of his unhappy amour, called her his daughter Clemensa, declared her to be free, gave particular directions respecting her education, and made a handsome permanent provision for her, manifesting thereby *a laudable instance of natural affection, and making the best atonement in his power, for his former indiscretion. And lastly, he appointed the same executor and trustee, as in his former will.
On the 26th day May, 1805, died Thos. F. Bates, father of the testator, who, on the 28th day of May, 1806, married Miss Miller, the appellant in this cause, which wrought so important a change in his family and affairs, that neither of the wills seemed at all adapted to his then situation and circumstances ; he therefore carefully cancelled the latter, by cutting out the signature of his name at the bottom of it, and let remain a little to the left of the signature cut out, the following words, to wit, “I revoke all other wills heretofore made by me,” signed “C. F. Bates,” all in his own hand-writing ; which will, so cancelled, with the clause of revocation remaining, he carefully preserved, and kept by him till the day of his death. The important question hence arises, whether this writing was a revocation of the will now in controversy ; and if so, 2dly, whether the will thus revoked, has since been SO' republished and acknowledged, by the testator, as to give it validity.
In considering this question I have not had reference to the English authorities, as few of them apply to the case before us, but am governed by our act of Assembly, concerning wills, passed December 13th, 1792.
By the third section of that act, the will before us was revocable, either by the testator’s destroying, cancelling, or obliterating the same, or causing it to be done in his presence, or by a subsequent will, codicil, or declaration in writing, made as aforesaid ; that is, either written wholly by himself, or attested by two or more credible witnesses, subscribing their names in his presence: the clause of revocation, or declaration in writing above mentioned, having been written wholly by the testator himself, and signed with his name, is precisely and fully within the provision of the act of Assembly ; and, to my mind, amounts to an absolute revocation of all former wills by him made. But it was contended by the appellee’s counsel, that the clause of revocation, *as they style it, was a substantive part of the will of September, 1803, and when that will was cancelled by the testator, the clause, consisting of only “nine little words.” was cancelled also ; but I am constrained to view the subject in a very different light; and those nine little words are very explicit, and with the attendant circumstances, appear to me to shew the quo animo, and to evince the testator’s mind, as clearly as if he had written a volume on the subject. Can it be, for a moment, believed, that when he was cancelling the will of .September, 1803, as being illy adapted to the then situation of his family' and affairs, that he could have entertained the most distant idea that the will of 1799, which was much more so, (inasmuch as he had then married a young wife,) *757 should be thereby revived ? I have a thorough conviction that it would not; for, had that been his intention, with how much more ease, and less trouble, could he have torn the will in pieces, or thrown it into the fire ; but instead of doing either, he cancelled the will, by carefully cutting the signature of his name from the body of it, leaving the declaration of revoking all other wills by him before made, with his name thereto, standing within half an inch of the name so •carefully cut from the body of the will. We find this cancelled will, then, and the revoking declaration, with the signature of his name annexed, deposited with the most precious treasures of his cabinet. And why was it thus carefully preserved ? As a standing testimonial that he then had no will in ■existence; and as an irrefragable proof, to my mind, that that was the real intention of the testator, is the circumstance of the will of 1799, being then in the custody of his mother, in the County of Goochland ; which, •on cancelling the will of 1803, would have been revived and in force, without some such written declaration of the testator.
But it is contended by the appellee’s counsel, as before noticed, that the will of 1803, with the revoking declaration annexed, is •one and the same instrument; and that •cutting- out the name of the testator from the body of the will, destroyed the whole, notwithstanding his signature remained *to the declaration, “that being a mere marginal note.” It is sometimes customary, where wills consist of several sheets of paper, for the testator to sign his name to each separate sheet ; but I believe, that in the whole catalogue and history of wills, there cannot be produced a single instance, where a man, acquainted with law, and versed in the technical terms of the science, ever put a •double signature to such a will as that of 1803, now before us, and consisting of less than half a sheet of paper, for the mere purpose of authenticating and giving validity to the same. And it appears to me, from a view of the paper itself, and the attendant •circumstances, that the declaration of revoking all other wills, was written and signed by the testator, at the time he cancelled the will, and by him carefully preserved, for the sole purpose of revoking the will now in controversy, which was then in the custody of his mother, in the county of Goochland; and it is highly probable, that, as the will of 1803 was made in the city of Richmond, where the testator then spent the greater part of his time, in the exercise of his profession, it was there cancelled also : but that seems a circumstance not very material. As it appears to me, that whether the declaration of revoking was written at the time of cancel-ling the will, or at the day of executing it, and carefully preserved by the testator, it amounts to the same thing, and is to have the same effect.
We are now to consider the second point, whether the will, thus revoked, has since been so republished, and acknowledged by the testator, as to give it validity.
In doing which, we must recur to a variety -of oral testimony, which is admitted to be sometimes proper, for the purpose of explaining the intention of a testator, and not by me, denied to be so, in the case now before the Court.
All the witnesses examined on the occasion appear to be persons of respectability, and of fair characters; and therefore, I give credence to the whole of their testimony as to facts ; and shall only consider what effect it ought (taken collectively) to have on the cause. I begin with the testimony in favour of the -will now in controversy ; and first*with that of Frederick Woodson, of whose integrity and candour I have not the smallest doubt.
Major Woodson states, that in February, or March, preceding the death of Mr. Bates, which happened on the 30th of May, 1808, the subject of both his wills was - mentioned, when Bates informed him he had a will, which he wrote many years ago ; but that he did not like it, and would make another in a short time. He told the deponent he did not approve of the will he had, but, in making another, he meant to make his mother independent in some degree : he meant to give her something at her own disposal. The conversation arose from the deponent (who was his uncle) finding fault with his conduct respecting his mother, in not' taking that care of her which he ought, as he had been informed, and was a kind of admonition, or reprimand from the witness. The testator spoke of his second will, as having been cancelled, and said that the first will was then in existence, and in the keeping of his mother, but that he did not like it.
The witness, on being interrogated by one of the Judges, said, he understood the testator’s dislike to the will (meaning the will now in question) was two-fold ; first, that it did not provide sufficient for his mother; and secondly, that he understood the property was somewhat incumbered, which the witness from hearing the will read, understood was the control given over it to Mr. Holman, the executor. This to me appears a strange inference indeed ; for the principal clause in the will is, “that his executor and trustee, George Holman, hold all the property of which the testator might die possessed, and not otherwise disposed of, in trust, for the benefit of Caroline M. Bates, (his mother.) and under her free and particular control, so long as she continues the wife, or widow, of the said Thomas F. Bates; and if she should marry again, and be in need of any thing, then to such proportion as the said trustee in his judgment shall think right, not exceeding one-third of the estate of the testator.” And this was thought by the witness, (and as he supposes, by the testator,) an inadequate '^provision for his mother, at a time when the testator had formed the most tender and important connection known in society ; and then had a young wife, in the seventh or eighth month of her pregnancy, with the prospect of a numerous progeny before him ; besides the moral, as well as natural obligations he was under, to make ample provision for his illegitimate daughter, already recognised and emancipated, and for whose welfare and happiness he had shewn very great anxiety and solicitude. To me it is inconceivable that any rational man, with the common feelings of humanity, thus circumstanced, could suffer such a will to exist for a single *758 moment: but we have already seen that it had been deliberately and solemnly revoked. Let us proceed with the evidence.
Earner Bradshaw, says “that on the 26th day of May, 1806, C. F. Bates informed him he had made a will, taking' care of his mother ; and the latter end of February, or March, meeting him in the field, he again told the witness he should take care of his mother; that it should not be all the»people in the world should prevent his taking care of her : said he had a will, and should take care of his mother at all events.”
Such a resolution was laudable, and worthy of a dutiful son, to an amiable and indulgent mother : but there were others who had still stronger claims on his justice, care, and attention, to wit, a wife, with the prospect of a growing family of children : for we are told in holy writ, (and it is one of the first laws of Moses,) that “a man shall leave his father and mother, and cleave to his wife; and they shall be one flesh.” And more especially was he bound by the ties, both of natural affection and of moral rectitude, to make ample provision for the unfortunate offspring of his juvenile indiscretion, and for whose welfare and happiness he had (as before noticed) shewn the greatest and most laudable solicitude; neither of whom (as wife or child) were in existence at the time of making the will in question, nor for several years thereafter ; and consequently could not have been contemplated by the testator. The consequences under the then *existing circumstances, could not be so distressing to the former branch of his family, because the issue of the marriage happened to be still-born ; and the law makes ample provision for the widow : but far different is the case respecting his natural daughter, who, together with her future offspring, the law has doomed to perpetual slavery, to her nearest blood relations, unless, emancipated by their clemency; and so great was Mr. Bates’s affection for her, that he put her to board (at a liberal price, which he punctually paid) in the house of Mr. William Clarkson, a respectable farmer in the county of Gooch-land, whom he told that (as soon as she should arrive at a proper age) he would send her to the town of Bethlehem, in Pennsylvania, where there is, perhaps, the best seminary for female education, in the United States.
These circumstances are noticed to refute the suggestion of one of the appellee’s counsel, “that Mr. Bates wished to conceal the existence of his unfortunate daughter;” and to shew the improbability — nay, the moral impossibility, that a man endued with common reason, and possessing the common feelings of humanity, could ever have contemplated the re-establishment of the will now before the Court, which he had so solemnly revoked upon the birth of his unfortunate child. And if it was expedient and proper to revoke it on the first remarkable change in his family, in the year 1803, how much more so was it, that it should remain revoked, after his intermarriage with the appellant, in the year 1806.
To proceed with the evidence.
Charles Hopkins says, that he lived with Mr. Bates, and continued with him as late as December, 1807 ; and heard Mr. Bates say, that, for a number of years past he had always kept a will by him ; and condemned it in others not to keep wills by them.
Christopher Anthony says, that in conversation with Mr. Bates, (but can say nothing as to the time, with certainty,) the latter mentioned that he always kept a will by him ; *and told him he had appointed Major Holman his executor. He thinks the conversation happened about the time of his marriage; but whether before or after he cannot say.
This seems to be the substance of all the evidence adduced in support of the will; and the one spoken of in Anthony’s deposition was, most probably, that of September, 1803 ; but be that as it may, this evidence, without any adverse testimony to weaken the force of it, does not, in,my conception, amount to the re-establishment of the will in question, which had been so solemnly, and deliberately, revoked by the testator. And when we come to consider the evidence of Edward Bolling, William Clarkson, William Gray, Winifred Heath and William Miller, all speaking of circumstances at later periods than those mentioned by the other witnesses, which it seems unnecessary to recapitulate ; the latter, in my apprehension, greatly preponderates, and shews it to have been the opinion of the whole family, even of Mrs. Bates the elder, herself, (who had for a long time had this will in her keeping, but had told her son, on his particular inquiry, that she had given it up to him,) that Mr. Bates had died intestate. And such was her surprise, when this will was accidentally found by her daughter about two months after his death, that she was extremely affected, and with great difficulty kept from fainting. And had Mr. Bates, in his last illness, when he was shewing great anxiety and wishing for some person to write him a will, or (according to Miss Heath) a good will, it is to be presumed that had he supposed the one before us in existence, and wished it to be revived, and established as his will, he would so have expressed himself. And it is much to be lamented, that he was, by the hand of providence, prevented from making a suitable provision for the two worthy objects of his filial and paternal regard and affection ; and for whose welfare and happiness he had uniformly shewn the most laudable solicitude ; and were "I to decide this case agreeably with my own private wishes, it would be to affirm the judgment of the District Court; but after the most mature reconsideration of the subject, I am thoroughly convinced that my former *opinion was correct, that the paper before the court is not the will of Charles F. Bates : and therefore the judgment of the District Court is erroneous, and ought to be reversed—
Which was the opinion of a majority of the Court.